SUPREME COURT.   Essex General Term.   July, 1855.   *C. L Allen, James* and *Bockes,* Justices.

THE PEOPLE *vs.* ALEXANDER MERRILL and JOSEPH RUSSELL.

A state has no jurisdiction of crimes committed beyond its territorial limits.

Every statute is presumed to be enacted with reference to the local jurisdiction of the legislature of each state.

Section 32 of 2 R. S. 665, which provides for the punishment, as for a felony, of every person who shall sell, or in any manner transfer, for any term, the services or labor of any black, mulatto or other person of color, who shall have been forcibly taken, inveigled or kidnapped from this state to any other state, place or country is not applicable to a sale or transfer made in another state of a black inveigled in this state.

To give to it a broader construction, and make it applicable to a sale or transfer made in another state, would make it repugnant to the constitution of the United States, (amendment, art. 6) which delares that in criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury *of the state and district wherein the crime shall have been committed;* and also to art. 4, sec. 2 of the constitution of the United States, which declares that the citizens of each state shall be entitled to all the immunities of the citizens of the several states; and provides that a person charged in any state with treason, or felony, or other crime, who shall flee from justice, or shall be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime.

Forms of an indictment for kidnapping, with intent to sell, under sec. 28 of 2 R. S. 664 and of an indictment for inveigling a person of color and selling him as a slave under section 32,—and of demurrer and joinder in demurrer.

This was a writ of error to the Saratoga Oyer and Terminer, in which court the defendants were tried on the following indictment:

SARATOGA COUNTY, *ss.*   *Be it remembered:* That at a court of General Sessions, holden at the court house, in the village of Ballston Spa, in and for the county of Saratoga, on the 28th day of August, 1854, before John A. Corey, county judge of the county of Saratoga, David Maxwell and Abram Sickler,

justices of the peace for sessions, in and for said county, and James W. Horton, clerk:

It is presented upon the oaths of the jurors, of the people of the state of New York, in and for the body of the county aforesaid, good and lawful men of the county aforesaid, then and there sworn and charged to inquire for the said people, for the body of the county aforesaid:—

*First.*—That Alexander Merrill and Joseph Russell, late of the town of Saratoga Springs, in the county of Saratoga aforesaid, on or about the tenth day of March, in the year of our Lord one thousand eight hundred and forty-one, with force and arms, at the said town of Saratoga Springs, in the county of Saratoga aforesaid, without lawful authority, one Solomon Northup, he, the said Solomon Northup, there living a free negro and a citizen of the state of New York, and in the peace of God and the people of said state, then and there being, did unlawfully and feloniously inveigle and kidnap with intent, him, the said Samuel Northup, unlawfully and feloniously against his will and without his consent, to cause to be sold as a slave. And him, the said Solomon Northup, unlawfully and feloniously and against his will, did sell as a slave, against the statute in such case made and provided, and against the peace of the people of the state of New York, and their dignity, and the jurors aforesaid, upon their oaths aforesaid, do further present: that from the time the said Alexander Merrill and Joseph Russell, had so inveigled and kidnapped the said Solomon Northup, to wit: the tenth day of March, 1841, during and until the first day of July, 1854, they, the said Alexander Merrill and Joseph Russell, have not been the inhabitants of the state of New York.

*Second.*—And the jurors aforesaid, upon their oaths aforesaid, do further present:

That the said Alexander Merrill and Joseph Russell, late of the town of Saratoga Springs, in the county of Saratoga aforesaid, afterwards, to wit: on the said tenth day of March, in the year of our Lord one thousand eight hundred and forty-one, with force and arms, at the said town of Saratoga Springs,

in the county of Saratoga aforesaid, without lawful authority, one Solomon Northup, he, the said Solomon Northup, then being a free negro and a citizen of the state of New York, and in the peace of God and of the people of the said state, then and there being, did unlawfully and feloniously inveigle to accompany them, the said Alexander Merrill and Joseph Russell, to the District of Columbia, with intent unlawfully and feloniously to cause the said Solomon Northup to be sold as a slave; and him, the said Solomon Northup, did then and there without his consent sell as a slave, to the great damage of the said Solomon Northup, against the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity.

And the jurors aforesaid, upon their oaths aforesaid, do further present:

That from the time the said Alexander Merrill and Joseph Russell had inveigled the said Solomon Northup, and him, the said Solomon Northup, sold as a slave aforesaid, to wit: the tenth day of March, 1841, during and until the first day of July, 1854, they, the said Alexander Merrill and Joseph Russell, were not usually resident within the state of New York.

*Third.*—And the jurors aforesaid, upon their oaths aforesaid, do further present:

That heretofore, to wit: on the tenth day of March, in the year of our Lord one thousand eight hundred and forty-one, at the town of Saratoga Springs, in the county of Saratoga aforesaid, one Solomon Northup, who was then a free negro and an inhabitant of the state of New York, was unlawfully and feloniously and without lawful authority, inveigled from this state to the city of Washington, in the district of Columbia, by the above mentioned Alexander Merrill and Joseph Russell. That the said Alexander Merrill and Joseph Russell, late of the said town of Saratoga Springs, in the said county of Saratoga, afterwards, to wit: on or about the first day of January, in the year of our Lord one thousand eight hundred and fifty-three, with force and arms, at the said city of Washington, unlawfully and feloniously sold and transferred the services and labor

convicted of of the said Solomon Northup, without his consent, to some person or persons to the jurors aforesaid unknown, for a term to the jurors aforesaid unknown, to the great damage of the said Solomon Northup, and against the statute in such case made and provided, and against the peace of the people of the state of New York, and their dignity.

*Fourth.*—And the jurors aforesaid, upon their oaths aforesaid, do further present:

That Alexander Merrill and Joseph Russell, late of the town of Saratoga Springs, in the county of Saratoga aforesaid, afterwards, to wit: on or about the first day of January, in the year of our Lord one thousand eight hundred and fifty-three, with force and arms, at the said town of Saratoga Springs, in the county of Saratoga aforesaid, without lawful authority, one Solomon Northup, then being a free negro and an inhabitant of the state of New York, and in the peace of God and of the people of the state of New York, then and there being, did unlawfully and feloniously inveigle from the state of New York to the city of Washington, in the District of Columbia, with intent, then and there, to cause the said Solomon Northup to be sold as a slave. And the said Alexander Merrill and Joseph Russell, him, the said Solomon Northup, did, then and there, with force and arms, unlawfully and feloniously sell as a slave to some person or persons to the jurors aforesaid unknown, to the great damage of him, the said Solomon Northup; against the statute in such case made and provided, and against the peace of the people of the state of New York, and their dignity.

To the first count the defendants pleaded not guilty.

To the second count the defendants demurred as follows:

And the said Alexander Merrill and Joseph Russell in their own proper persons, come into court here, having heard the second count of the said indictment read and say:

That the said count and the matters therein contained, in manner and form as the same are above stated and set forth,

are not sufficient in law, and that the said Alexander Merrill and Joseph Russell are not bound by the law of the land to answer the same, and this they are ready to verify; wherefore, for want of a sufficient indictment in this behalf, the said Alexander Merrill and Joseph Russell pray judgment, and that by the court they may be dismissed and discharged from the said premises in the said second count specified."

Similar demurrers were interposed to the third and fourth counts. The public prosecutor joined in demurrer as follows;

And William T. Odell, district attorney of Saratoga county, who prosecutes for the people of the state of New York in this behalf, saith:

" That the said second count in the said indictment, and the matters therein contained in manner and form as the same are above stated and set forth, are sufficient in law to compel the said Alexander Merrill and Joseph Russell to answer the same; and the said William T. Odell, who prosecutes as aforesaid, is ready to verify and prove the same as the court here shall direct and award; therefore, inasmuch as the said Alexander Merrill and Joseph Russell have not answered to the said count in the said indictment, nor hitherto in any manner denied the same, the said William T. Odell, for the said people, prays judgment on the said count, and that the said Alexander Merrill and Joseph Russell may be convicted of the premises in the said count specified."

Similar joinders were put in to the other demurrers. Judgment upon the demurrers to the second, third and fourth counts was given for the defendants, whereupon a writ of error was prosecuted by the district attorney to this court.

*W. T. Odell* (District Attorney) for the people.

*Beach, Cochrane* and *Wait,* for defendants.

*By the Court,* C. L. ALLEN, J.—There is no objection to the count under the thirtieth section, and to this count the defendants pleaded not guilty. That section enacts, that any person

The People v. Merrill.

the felony there declared, shall, upon conviction, be punished by imprisonment in a state prison not exceeding ten years. The offence there created and declared, is one arising upon the *intent* of the party *formed in this state*, and which constitutes the crime committed within the state, and to punish which, on conviction, the tribunals of the state have exclusive and perfect jurisdiction. The duelling act, so called, (2 *R. S.* 686,) provides for the punishment of those who shall thereafter fight a duel within the state, declaring the offence to be a felony; and then follows the fifth section against the same act, declaring, that if any inhabitant of the state shall leave the same for the purpose of eluding the operation of its provisions, *with the intent* of giving or receiving any challenge therein prohibited, or of aiding or abetting in giving or receiving such challenge, and shall give or receive any such challenge or shall aid or abet in giving and receiving the same without the state, he shall be deemed as guilty, *and shall be subject to the like punishment as if the offence had been committed within this state.* Here, again, the *intent conceived* in this state, was made to constitute the crime, the giving and receiving the challenge *without* the state being made evidence of *such* intent;—and the concluding part of the section declaring that *the punishment*, upon conviction of such *intent*, shall be the same *as if the offence had been committed within the state*, was a legislative construction or *adjudication*, if proper so to speak, that if the act were committed *without* the state, unaccompanied by the intent *conceived* by the *inhabitant* of the state *before leaving it*, our courts would have no jurisdiction over it.

But the thirty-fourth section of the act under which the objectionable counts in this case were framed, is somewhat broader in its terms as to assertion of jurisdiction than the section of the duelling act just adverted to. It declares that " every person who shall sell, or in any manner transfer, for any term, the services or labor of any black, mulatto, or other person of color, *who shall have been forcibly taken, inveigled or kidnapped* from this state, to any other state, place or country, shall, upon conviction, be punished by imprisonment in a state

prison not exceeding ten years, or in a county jail not exceeding one year, or by a fine not exceeding $1,000, or by both such fine or imprisonment."

It must be presumed, in construing this section, that the intention of the legislature was to confine the courts of the state, to the offences or felonies over which it had jurisdiction, and to them alone. It can not be pretended or assumed that a state has jurisdiction over crimes committed beyond its territorial limits. The first section of the 2 R. S., 697, (4 *ed.* 881,) declares that the several courts of justice organized under the constitution and laws of this state, possess the sole and exclusive jurisdiction of trying and punishing in the manner prescribed by law, all persons for offences and· crimes committed *within the boundaries of this state*, and excepting only such as are exclusively cognizable by the courts deriving their jurisdiction under the laws and constitution of the United States. This enactment is in conformity to the law as always understood from the earliest period. ( *Vattel's Law of Nations*, 108, *Story's Conflict of Laws*, 516, 518, 619, *et seq.*)

It was early adjudicated that our courts had no jurisdiction over offences committed in other states. In the case of *The People* v. *Wrights*, (2 *Caines' R.*, 213,) the defendants were in custody of the sheriff on heavy civil process, and while thus in custody a warrant was issued upon an indictment against them found in Massachusetts for a crime committed there. The court refused to comit them, saying they had no jurisdiction — and that the constitution pointed out the mode by which offenders could be claimed by a foreign state. The case of *The People* v. *Gardiner*, (2 *J. R.*, 477,) was one where the prisoner was indicted and convicted of felony at the General Sessions, in Washington county, for stealing a horse. It turned out in evidence that the original taking was in Vermont, but that the prisoner was arrested in Washington county with the horse in his possession. The court decided that the prisoner could not be tried for the offence in this state, the original taking having been without its jurisdiction, and that the offence did not continue and accompany the possession of the thing stolen, as it

The People *v.* Merrill.

did when property was stolen in one county in the state, and the thief was found in another county with the stolen property in his possession. In *The People* v. *Schenck* (2 *J. R.*, 479,) the prisoner was discharged because it turned out that the gun, which he was charged with stealing, was taken in New Jersey, and brought into New York, and there offered for sale by him. But the court caused him to be detained in custody for thirteen weeks to enable the executive of New Jersey to apply for his delivery to the proper officers of that state. It is not improbable that these decisions, particularly the two latter, somewhat aided in the enactment, (2 *R. S.*, 698, § 4,) by which it is declared that " every person who shall feloniously steal the property of another, in any other state or country, and shall bring the same into this state, may be convicted and punished in the same manner as if such larceny had been committed in this state;" and in every such case, such larceny may be charged to have been committed in any town or city into, or through which, such stolen property shall have been brought."

The case of the *People agt. Burke*, (11 *Wend.* 129,) was decided after the passage of this section. It appeared in evidence in that case, that the prisoner, who was indicted for grand larceny, and charged with having stolen money in the town of Gates, in the county of Monroe, stole the money in Upper Canada and came into Gates, where a part of the stolen money was found in his possession. The case, as was correctly remarked by the Chief Justice, Savage, came precisely within the statute, which was, in his opinion, constitutional, and was not justly liable to the objection, that the legislature undertook to punish offences committed against another' government. Why? Because it was not the larceny in Canada which the court of this state undertook to punish, but that committed in the state of New York, in every place into which the stolen property had been brought. That the statute was only recognizing the common law, (*Sec.* 1, *Ch. Crim. Law, p.* 179; 13 *Coke*, 53,) by which the possession of stolen property, in contemplation of law, remains in the owner, and the thief is guilty of theft in every place into which he carries the stolen goods.

The offence is committed in this state by bringing the stolen property into it; " for being in possession of the stolen property;" *animo furandi.* The statute was likened to that for punishing persons having in their possession forged bank notes. " No one ever doubted," remarks the learned judge, " the propriety of a conviction if it appeared (as it generally does in such cases,) that the notes were actually forged in Canada. The offence is complete in this state by having them in *possession with intent to pass them.*" So in the statute we are now considering, inveighing or enticing a colored man, in this state, out of its limits, with *intent* to sell him, constitutes the crime here, as before intimated.

The doctrine that a person can not be punished for a crime committed without the state, is not only not denied, but broadly admitted in the case in 11 Wend., as it was also in the cases of the *People* agt. *Sturdevant,* (23 *Wend.* 418,) and the *People* agt. *Charles,* (3 *Denio,* 212.) In both those cases the offence was complete by the publication of, or the sale of lottery tickets, *in this state,* though the lotteries in which they were sold, were authorized by the laws of other states.

The case also of the *People* agt. *Adams,* (3 *Denio,* 190,) affirms the same principles. The defendant was a resident of the state of Ohio, and in that state made and executed the false receipts and drafts by which the money was fraudulently, and by false pretences, obtained from the house in New York, the papers having been presented to the firm in New York by agents of the defendant, he having remained during the transaction in the state of Ohio.

The court held that the offence was committed where the false pretence was used, and where the money was obtained; and Beardsley, J., after a very able review of all the cases bearing upon the question, remarked, in delivering the opinion of the court, that the crime was committed in the city of New York, and not elsewhere; that the defendant, although acting through his innocent agents there, and not personally present within this state, was here in purpose and design, and acted by those agents; " *qui facit per alium facit per se.*" That the crime

The People *v.* Merrill.

was perpetrated within this state, and that, therefore, our courts had an undoubted jurisdiction; that jurisdiction over the criminal necessarily followed, " *crimen trahit personam,*" and the offender should be held responsible when afterwards found within the state; and the conclusion arrived at finally, was that, although civil redress for this violation of a statute of our state would be afforded by the courts of Ohio, as well as New York, yet that the law of this state creating the offence for which the defendant was indicted, could only be enforced by its own tribunals. The judgment in this case was affirmed by the Court of Appeals, (1 *Comst. R.* 173.) The court there reiterating the averment that the crime was committed *within the state*, and through the instrumentality of the defendant though absent from it, and a resident of another state at the time. One of the court remarked, that it was a matter of little consequence under the circumstances of the case, whether the defendant owed allegiance to the state or not; that there were only two cases where the question of allegiance could have any thing to do with the criminal prosecution, one was, where the accused was charged with a breach of the duty of allegiance, as in cases of treason; and the other was, *where the government purposes to punish offences committed by its own citizens, beyond the territorial limits of the state*, almost exactly defining and deciding, in my judgment, the question in the case now under consideration. The same doctrine is recognized in Massachusetts, as well as in this state. (2 *Mass. R.* 132, 134; 13 *Mass.* 4,) and also in Pennsylvania, (5 *Bin.* 617.)

Thus it will be seen, that the several cases above referred to, uniformly agree, that the several offences considered in them were committed *in this state*, and that therefore, our courts had jurisdiction over them, and over the persons committing them, when found within the state; and that they all admit, that the courts could have had no jurisdiction, if those offences had been perpetrated without the limits of the state. "The different states," it has been truly remarked, by an eminent judge, " are altogether as independent of " each other, in point of jurisdic-

tion, as any two nations," and an offence committed in one state, can not be tried in another.

The precedents and authorities in England, cited by the counsel for the prosecution, all grew out of special statutes of that realm. As has been already remarked, by the common law, offences were local, and could only be tried in the county where committed. (*See* 1 *Ch. Crim. Law,* 150, 177, 179.) The several acts of parliament are there cited and commented upon which provide for the trial in one county of certain offences committed in another. Under the statute of 33 Henry VIII, c. 23, arose the case of *Ney* agt. *Sawyer,* (61 c. *L. R.* 100,) cited by the counsel on both sides, on the argument of this demurrer; it was held in that case that a British subject was triable in that country for the murder of another British subject, committed on land within the territory of a foreign independent kingdom. The argument in that case, in support of the jurisdiction was the same that is urged here; that there is a mutual contract between the government and its citizens; that the citizen is bound to yield obedience to the laws, and that the government is bound to protect the citizen, and the additional argument in the case in England, was derived from the preamble of the act of Henry VIII, that persons guilty of murder or manslaughter, committed out of the realm, and not upon the high seas, might, without the remedy afforded by the act, escape punishment. It is to be observed, in passing, that the statute under which this conviction was had, was repealed by that of 9 Geo. IV, c. 31, and other provisions instituted in its stead. The counsel for the people in this case, while he admits that a similar jurisdiction to that which he claims here, was derived in England by special statute, contends that our statute is sufficiently broad to sustain the counts demurred to.

I have already intimated that every statute is presumed to be enacted with reference to the local jurisdiction of the legislature of each state. The section is very general.

" *Every person* who shall sell *or in any manner transfer the services* of any black, who *shall have been* forcibly taken, in-

veigled or kidnapped from this state to any other state, place or country, shall, upon conviction, be punished." It does not confine the offence to persons who shall be residents of the state at the time of the perpetration of it, nor does it confine its commission against citizens of the state alone, for the protection of which it is supposed to be intended to provide. The phraseology, however, is like that of most, if not all the other sections and statutes in relation to crimes and misdemeanors. For instance, the 29th section of the act, (2 *R. S.* 664,) to punish for *mayhem*, uses the same general language, when it declares that *every person*, who from premeditated design, shall cut off or disable any limb or member, shall, upon conviction, be punished by imprisonment in a state prison; and so the statutes respecting murder and manslaughter, and the accessories thereto, are equally general in their phraseology. Yet no one can contend that a citizen of this state, who is guilty of the murder of another citizen in the state of New Jersey, can be tried for that crime in this state. The district attorney has indeed put forth the averment, that if an *alien* should be guilty of mayhem upon a citizen of the state, beyond its territorial limits, and the courts had obtained jurisdiction of his person, by his voluntarily coming within the state, he could be tried and punished; but the authority which he cites (*Story's Conflict of Laws,* § 5, *p.* 625, 626) does not support his position. Story remarks, in a note to one of the sections quoted, that " the more common usage in modern times is to remand the criminal to the country or state where the crime was committed, the practice of most countries being to surrender up fugitives from justice, who escape into their territories, and seek an asylum from punishment." It may, therefore, be argued that the section is to be limited in its application to a sale within the state, and the description " who shall have been forcibly taken," &c., is referable to the time of indictment and trial, and not to the time of sale; and that the offence probably aimed at by the legislature, was a sale within the state, with intent forcibly to remove; and it might refer to removing and selling afterwards.

At all events, whatever may have been the doctrine in England, under their special statutes, our courts are governed by the common law in our own state, and by comparing all those statutes together, it is evident that their jurisdiction is limited to offences within the state; (2 *R. S.*, *4th ed.*, *p.* 881; 1 *Kent Com.*, *note R*) and the cases cited and commented on above, show what offences shall be considered as having been com- mitted in the state, and do not include the one embraced in the counts demurred to in this case.

It is argued that there is an obvious necessity for the power of the state to pass the section which it is insisted supports these counts. That the state can not protect its citizens with- out it; that the state must have such power and right. To this, it may be answered:

*First.* That this state, as a sovereign and independent mem- ber of the confederacy, can not protect its citizens beyond its own territorial limits.

Suppose a citizen is imprisoned in Europe, or in Cuba, to whom is he to apply for protection? Undoubtedly to the general government. The right to arrest and try offences out of the state, is founded upon its duty and power to protect; and it can not protect beyond its boundaries. The doctrine, there- fore, can hardly be said to apply to the individual states, but to the government of the union. If an individual passes the boundaries of his own state, and enters another, he retains his rights and high character as an American citizen, but he sub- jects himself, at the same time, to the laws of the state to which he removes or in which he abides. The great inquiry when the general government interferes in behalf of this citizen, is whether his personal rights have been violated, and whether he has or not, committed an offence against the laws of the government which is assuming to punish him. If he has, he is left subject to the laws, and can obtain no further redress.

*Again*, this argument may be answered, secondly, by remark- ing that the section is general, and not confined to the punish- ment of or protection of residents within the state. It embraces *every person* who shall sell any black, who may have been

The People *v.* Merrill.

*forcibly taken or inveigled* from the state, by another, without the knowledge of the seller, who may be doing an act entirely consistent with and in obedience to the laws of the state in which he makes the sale. · This could never be tolerated, and was never intended. The conclusion is this, that the legislature intended to provide against kidnapping; that they created an offence cognizable by the laws, when they enacted the 31st section, declaring that if any person should inveigle a person of color out of the *state* with *intent* to sell and dispose of him as a slave, it should be a felony. The actual sale, or attempt to sell, out of the state, would undoubtedly be evidence of the felonious intent, and would in all courts be so received; conviction would probably follow, and the whole object of the statute be fully answered by the infliction of deserved punishment upon the culprit.

*Second.* But whatever construction we give to this statute, and if it is indeed to be considered as broad and comprehensive in its terms, as is contended for by the counsel for the people, it is then, in my judgment, repugnant to the constitution of the United States. The 6th article of the amendments to that instrument, declares that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury, *of the state and district wherein the crime shall have been committed.*

The penal acts of one state can have no operation in another state. The courts of this state, have no power to enforce here the criminal laws of another state. Here, laws are local, and affect nothing more than they can reach. (*Story's Conflict of Laws,* 516, 517; *Sears,* 619, 620, 621; 14 *J. R.* 338, 340; *Taylor N. C. R.* 65.) .

It is also not in accordance with the 2d section of the 4th article of the same constitution. That declares that the citizens of each shall be entitled to all the immunities of the citizens in the several states, and provides that a person charged in any state with treason or felony or other crime, who shall flee from justice, or shall be found in another state, shall, on demand of the executive authority of the state from which he fled, be de-

livered up to be removed to the state having jurisdiction of the crime. The third and fourth counts of the indictment charge substantially that Northup, on the 10th day of March, 1841, was a free negro, and inhabitant of the state of New York; that he was on that day, unlawfully and feloniously, and without lawful authority, inveigled from this state to the city of Washington, in the District of Columbia, by the defendants, and that they, on the first day of January, 1853, at the city of Washington, unlawfully and feloniously sold him as a slave. Now the act of selling was a lawful one in the District of Columbia, for congress, though often invoked so to do, have not assumed to prohibit the sale of slaves in that district. The defendants therefore had the right to sell, by the laws of the district, and for that act alone were not punishable there. Suppose any other person, who had not participated at all in enticing Northup from this state, had found him at Washington, and claimed and sold him there, could he have been indicted and tried here, if caught, for such sale? Undoubtedly not. And yet the section, if the construction is given to it which is contended for here, includes just such a case. Could such a person when indicted, have been demanded here as a fugitive from justice, under the 2d subdivision of article four? There is but one reply, it appears to me, that can properly be given to these questions. It is no answer to say that the persons selling were guilty of inveigling or kidnapping; that is another distinct offence, and is provided for by the 30th section.

The inveigling with *intent* to sell there constitutes the crime, and is properly and clearly punishable as already shown. It is the sale alone, for which the defendants are indicted, under the counts we are now considering, and that sale in a district where it was perfectly lawful.

It can not be said that the constitution of the United States is not operative upon a case of this character. It is the supreme law of the land, and binding upon all states and upon all state courts. It is insisted that the state is an independent sovereignty in every thing except what is granted to the United States by the articles of confederation, and provided for by the

The People *v.* Merrill.

constitution.   This may be conceded, and yet that instrument may be binding in this particular case; our statute coming in conflict with two of its particular provisions.   The constitution was intended to be binding, as it regards the rights of the citizens of the several states, upon the people of the whole union. It was never intended that a legislature should violate state comity, or national rights, as the section in question does, by assuming to punish as a felony, a sale of property in a state or district where the right exists, by the laws of the locality, to make such sale; and when the seller may have no knowledge whatever of the forcible abduction from the state which claims to punish him.

It can not be seriously, at all events, contended, in my judgment, that one selling a slave in a foreign state, where it is lawful, can be held criminally responsible for the act of another, in removing such slave from the state without any knowledge of such removal.   " Every man shall answer for his own sins," is a correct maxim in morals, as well as law, and no legislative body possesses the power, in my judgment, to alter it.

I am happy, in thus feeling myself required to come to the conclusion that the judgment in this case must be affirmed, that the defendants, if guilty, are not to escape trial and conviction. The 30th section makes ample provision, within constitutional limits, for their punishment, and if convicted, under the first count, which is framed under that section, the whole object of the law will be answered, state sovereignty will be maintained, the rights of the citizens protected, and no principle will be violated.

No state can ask more than this, and no wise legislature will ever be disposed to grant it.

Judgment of the Oyer and Terminer should be affirmed.